# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN JONES, *et al.*, | ) | Case No. 1:20-cv-00511 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | William H. Baughman, Jr. |
| LUBRIZOL ADVANCED | ) | |
| MATERIALS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Pursuant to Rule 12(f) and Rule 23, Defendants The Lubrizol Corporation and Lubrizol Advanced Materials, Inc., Cresline Plastic Pipe Company Inc., and Charlotte Pipe and Foundry Company move to strike the class allegations in Plaintiffs' consolidated amended complaint. (ECF No. 54.) Because the classes as defined inescapably include members who have not suffered an injury, and no amount of discovery can cure that legal defect, the Court **GRANTS** the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

This case remains in the early stages of discovery following the Court's ruling on Defendants' motions to dismiss.

### A. Plaintiffs' Remaining Claims

Based on the Court's ruling, each of the named Plaintiffs has a claim for breach of express warranty under the law of the State in which he or she lives. Additionally, Plaintiffs have two additional claims (for negligence and negligent failure to warn)

under Massachusetts law.  Specifically, Plaintiffs have the following remaining claims.

### A.1.  The Joneses' Claims Under Arizona Law

Plaintiffs Kevin and Janet Jones state a claim for breach of express warranty (Count VI) on two theories:  (1) Charlotte Pipe failed to replace their allegedly defective pipes and fittings under the 1999 limited warranty; and (2) Charlotte Pipe and Lubrizol provided products defective in workmanship and materials under the express warranties created through the brochures, catalogs, websites and marketing materials of Charlotte Pipe and Lubrizol.  Plaintiffs seek to bring this claim on behalf of a nationwide class or an Arizona class of individuals and entities who purchased FlowGuard Gold from Charlotte Pipe or its predecessor Thompson Plastics.  (ECF No. 17, ¶ 194, PageID #229; *id.*, ¶ 132, PageID #216.)

### A.2.  Mr. Cochrane's Claims Under Massachusetts Law

Plaintiff Douglas Cochrane states a claim for breach of the express warranties (Count VI) on two theories:  (1) Charlotte Pipe breached the applicable limited warranty by failing to replace defective FlowGuard Gold; and (2) Charlotte Pipe and Lubrizol breached the express warranties made in their brochures, catalogs, websites and marketing materials.  Additionally, Plaintiff states claims for negligence (Count I) and negligent failure to warn (Count II).  (ECF No. 47, PageID #1062.)  Plaintiffs seek to bring this claim on behalf of a nationwide class or a Massachusetts class of individuals and entities who purchased FlowGuard Gold from Charlotte Pipe or its predecessor Thompson Plastics.  (ECF No. 17, ¶ 194, PageID #229; *id.*, ¶ 132, PageID #216.)

### A.3.    Ms. Baker's Claims Under Washington Law

Plaintiff Donna Baker states a claim for breach of express warranty (Count VI) on two theories:  (1) Charlotte Pipe failed to replace the allegedly defective pipes under the alleged written express warranty; and (2) Charlotte Pipe breached the warranty created through its brochures, catalogs, websites and marketing materials. Plaintiff also states a breach of warranty claim against Lubrizol.  Plaintiffs seek to bring this claim on behalf of a nationwide class or a Washington class of individuals and entities who purchased FlowGuard Gold from Charlotte Pipe or its predecessor Thompson Plastics.  (ECF No. 17, ¶ 194, PageID #229; *id.*, ¶ 132, PageID #217.)

### A.4.    Ms. Martin's Claims Under Michigan Law

Plaintiff Catherine Martin states a claim for breach of express warranty (Count VI) against Cresline Plastic on two theories:  (1) the failure to repair and replace the allegedly defective pipes under the Cresline Written Warranties; and (2) providing a defective product under the Cresline Additional Warranties.  They also state a claim for breach of express warranty against Lubrizol.  Plaintiffs seek to bring this claim on behalf of a nationwide class or a Michigan class of individuals and entities who purchased FlowGuard Gold from Cresline Plastic.  (ECF No. 17, ¶ 194, PageID #229; *id.*, ¶ 132, PageID #217.)

### B.    Relevant Facts

As to these remaining claims, the consolidated amended complaint pleads the following relevant facts.  Although Defendants attach some basic information about the FlowGuard Gold pipes at issue to their motion to strike (ECF No. 54-1), they make no specific arguments based on that document.  In addition, Defendants' reply brief

presents written discovery responses from Plaintiffs. (*See* ECF No. 58.) But presenting new evidence and arguments for the first time in reply is *not* proper, so the Court disregards those submissions and Defendants' arguments based on them.

### B.1.   The Joneses of Arizona

Plaintiffs Kevin and Janet Jones live in Arizona. (ECF No. 17, ¶ 10, PageID #183.) In 1999, they constructed a new home and installed FlowGuard Gold pipes. (ECF No. 17, ¶ 21, PageID #185.)

Twenty years later, in October 2019, the pipes leaked, eventually causing the ceiling of one of the bedrooms to cave in. (*Id.*, ¶ 22.) When they first discovered the leak, they turned off the water to their house and put a bucket under the leak. (*Id.*, ¶ 23.) They called a contractor to repair the leak, and the contractor told them the leaky pipe was brittle. (*Id.*) Later, another leak occurred in the ceiling above the home's kitchen and front bathroom, damaging those areas of the home. (*Id.*, ¶ 24.) Due to the leaks and the pipes' alleged brittleness, the Joneses replumbed their house, at a cost in excess of $11,000 apart from incidental hotel bills totaling more than $2,000. (*Id.*, ¶ 27, PageID #186.) The Jones's insurance only covered part of those claimed damages. (*Id.*, ¶ 25.)

Mrs. Jones contacted Charlotte Pipe to make a warranty claim. (*Id.*, ¶ 28.) She spoke with a company representative, but claims Charlotte Pipe never sent her the form required to process her claim. (*Id.*, ¶¶ 29–30.) The consolidated amended complaint includes photos of the Jones's allegedly defective FlowGuard Gold pipes. (*Id.*, ¶ 32, PageID #187–88.)

### B.2.   Mr. Cochrane of Massachusetts

Plaintiff Douglas Cochrane lives in Massachusetts.  (ECF No. 17, ¶ 11, PageID #183.)  In 2008, he built his home with FlowGuard Gold pipes and fittings designed by Lubrizol and Charlotte Pipe.  (*Id.*, ¶ 34, PageID #188.)  He claims his FlowGuard Gold pipes first leaked in June 2019.  (*Id.*, ¶ 35.)  That leak flooded his basement, damaged his ceiling tiles, trim, carpet and furniture, and caused his insurance company to drop him.  (*Id.*, ¶¶ 35–36.)  Between August 2019 and May 2020, he claims further leaks damaged his house.  (*Id.*, ¶ 37, PageID #189.)

He contacted Charlotte Pipe and initiated a warranty claim.  (*Id.*, ¶ 38.)  He sent Charlotte Pipe photos and a sample of the failed FlowGuard Gold fitting.  (*Id.*)  Two months later, Charlotte Pipe sent him an email and report concluding that the pipe and fitting was not defectively manufactured and failed "due to environmental stress cracking caused by exposure on the exterior to incompatible plasticizers and nonionic surfactants[.]"  (*Id.*, ¶ 39.)  Accordingly, Charlotte Pipe rejected his claim.  (*Id.*, ¶ 40.)

His house continues to experience leaks, and Mr. Cochrane believes his pipes will have to be replaced.  (*Id.*, ¶ 41–42, PageID #189–90.)  He claims he would not have purchased a house with FlowGuard Gold pipes and fittings had he known the pipes would fail.  (*Id.*, ¶ 45, PageID #190.)  The consolidated amended complaint includes photos of the allegedly defective FlowGuard Gold pipes and fittings from his house.  (*Id.*, ¶ 46, PageID #191.)

On May 4, 2020, Mr. Cochrane's counsel sent a letter to Lubrizol and Charlotte Pipe, notifying them of alleged violations of Massachusetts laws and demanded relief

5

for himself and a putative Massachusetts class against Charlotte Pipe.  (*Id.*, ¶ 43, PageID #190.)  According to the consolidated amended complaint, a month later, Lubrizol and Charlotte Pipe failed to offer any "fair and reasonable" relief.  (*Id.*, ¶ 44.)

### B.3.  Ms. Baker of Washington

Plaintiff Donna Baker lives in Washington.  (ECF No. 17, ¶ 12, PageID #183.) During construction of her home in 2004, FlowGuard Gold pipes and fittings designed and manufactured by Lubrizol, Charlotte Pipe, and Thompson Plastics were installed.  (*Id.*, ¶ 48, PageID #192.)  Pipes in her living room wall leaked in November 2018 and damaged the wall, requiring it to be cut open to replace the failed piping.  (*Id.*, ¶ 49.)  In July 2020, Ms. Baker discovered mold in her spare bedroom. (*Id.*, ¶ 50, PageID #192–93.)  A mold remediation company discovered a leak in the bedroom wall and elsewhere, so Ms. Baker had the FlowGuard Gold pipes in the bedroom wall replaced.  (*Id.*, PageID #193.)  Ms. Baker's insurance company did not cover the damage leaks from the FlowGuard Gold pipes allegedly caused.  (*Id.*, ¶ 51.)

After the bedroom leak, Ms. Baker initiated a warranty claim with Charlotte Pipe, complete with photos of the failed product.  (*Id.*, ¶ 52.)  Charlotte Pipe denied the claim, explaining that Thompson Plastics manufactured Ms. Baker's piping, not Charlotte Plastics.  (*Id.*, ¶ 53.)  The consolidated amended complaint includes photos of both leaks.  (*Id.*, ¶¶ 56–57, PageID #194–97.)

### B.4.  Ms. Martin of Michigan

Plaintiff Catherine Martin lives in Michigan.  (ECF No. 17, ¶ 13, PageID #183.) In 1997, construction of her house used FlowGuard Gold pipes Lubrizol and Cresline Plastic manufactured.  (*Id.*, ¶ 59, PageID #197.)  During replacement of a bathroom

vanity in March 2019, a FlowGuard Gold pipe broke and leaked, causing the kitchen ceiling beneath to sag, which required replacement and repainting. (*Id.*, ¶ 60.) About a year later, in February 2020, a FlowGuard Gold pipe broke behind Ms. Martin's laundry room wall after a flooring installer turned off the water to her washing machine. (*Id.*, ¶ 61.) As a result, the laundry room, basement, and ductwork flooded and required the removal and replacement of drywall. (*Id.*) The next day, a FlowGuard Gold pipe broke and flooded Ms. Martin's basement. (*Id.*, ¶ 62, PageID #198.) During the repairs, a plumber told Ms. Martin the FlowGuard Gold pipe was brittle and difficult to cut. (*Id.*, ¶ 63.)

Ms. Martin submitted a warranty claim to Cresline Plastic on March 4, 2020. She included details of the problems FlowGuard Gold had caused and included photographs and a piece of the FlowGuard Gold pipe that had leaked or was adjacent to the leaks. (*Id.*, ¶ 64.) Three weeks later, Cresline Plastic responded by email that it inspected the samples Ms. Martin submitted and found them "free of manufacturing defects." (*Id.*, ¶ 65.) Ms. Martin included photos of the allegedly defective pipe in the consolidated amended complaint. (*Id.*, ¶ 71, PageID #200.)

## C.    Warranties

Other than Mr. Cochrane's negligence claims, Plaintiffs' remaining claims allege breach of warranties of FlowGuard Gold products Charlotte Pipe and Cresline Plastic offered or representations Defendants made about the products when marketing them.

### C.1. Lubrizol

Plaintiffs do not allege that Lubrizol provides a written warranty for any FlowGuard Gold product, but make a general claim that Lubrizol warranted the product through "brochures, catalogs, websites and marketing materials." (*Id.*, ¶ 200, PageID #230.) To support this allegation, the consolidated amended complaint points to various representations the company makes about the product. For example, Lubrizol touts that "FlowGuard Gold piping systems are backed by a nearly 60-year track record and provide long-term reliability and performance. The systems are durable and will not degrade, pit or scale, even when in contact with high chlorine levels." (*Id.*, ¶ 78, PageID #202.) Further, Lubrizol claims that the product is "100% immune to corrosion or degradation cause by chlorinated water and *will never fail* due to contact with normal drinking water." (*Id.*, ¶ 79.) Additionally, Lubrizol boasts that "FlowGuard Gold pipe and fittings are designed for a 50-year service life." (*Id.*)

### C.2. Charlotte Pipe

In 1999, Charlotte Pipe's written warranty provided that the pipes and fittings would "be free from manufacturing defects and conform to currently applicable ASTM standards under normal use and service for as long as the single-family residential dwelling is owned and occupied by the original owner." (*Id.*, ¶ 99, PageID #206.) Charlotte Pipe modified its warranty four times between 1997 and 2009. (*See* ECF No. 30-2, PageID #493.) Charlotte Pipe attached copies of the relevant warranties to its motion to dismiss. (ECF Nos. 30-3, 30-4, 30-5 & 30-6.) In addition, Plaintiffs allege that Charlotte Pipe created express warranties for FlowGuard Gold products

8

through "brochures, catalogs, websites and marketing materials." (*Id.*, ¶ 200, PageID #230.)

### C.2.a.  1999 Limited Warranty

Charlotte Pipe's 1999 Limited Warranty was effective when the Joneses contracted to have their home built and

> warrants to the original owner and occupant of the residential dwelling in which its CPVC-CTS FlowGuard Gold Pipe and Fittings (the "Products") have been installed that the Products will be free of defects in material and workmanship under normal use and service for as long as the residential dwelling is owned and occupied by the original owner.

(ECF No. 30-3, PageID #495.)  If any FlowGuard Gold products "fail during the warranty period due to defects in materials or workmanship," the warranty promises that Charlotte Pipe will "replace the defective pipe or fitting at its expense and after inspection and determination that the Product is defective." (*Id.*)

This 1999 warranty also includes exclusions and limitations. (*See generally id.*)  It excludes liability for incidental and consequential damages to the extent State law permits.  Further, it excludes liability for "other damage including, without limitation, costs of removal and reinstallation of the product.  Loss of use.  Loss of profits or personal injuries or property damage whether arising out of breach of warranty, breach of contract or otherwise." (*Id.*)  Also, the 1999 warranty limits the implied warranties of merchantability and fitness for a particular purpose to the "time that the residential dwelling in which the Products have been installed is owned and occupied by the original owner or five (5) years from the date of purchase of said product, whichever is less." (*Id.*)  Like the damages exclusion, these limitations only apply to the extent State law permits. (*Id.*)  Additionally, the 1999 warranty lists five

circumstances under which the warranty will not apply, none of which is relevant to resolving Charlotte Pipe's motion to dismiss.

Finally, Charlotte Pipe's 1999 warranty provides that it "will not apply to any Products for which a defect is claimed unless written notice is mailed to Charlotte within 30 days after the date of the discovery of any such defect" at a specific address. (*Id*.)

### C.2.b.  Other Limited Warranties

Over the years, Charlotte Pipe issued other limited warranties with various changes from the 1999 warranty.  (*See* ECF No. 30-2.)  In addition to the 1999 warranty, Charlotte identifies three other written limited warranties it deems relevant.  (*Id*.)  The other warranties were effective March 16, 2000 through February 2, 2002 (ECF No. 30-4); January 25, 2005 through March 23, 2008 (ECF No. 30-5); and March 24, 2008 through October 16, 2009 (ECF No. 30-6).  The March 2000 limited warranty changes "free of defects in material and workmanship" to "free from manufacturing defects" and adds that FlowGuard Gold will "conform to currently applicable ASTM standards."  (ECF No. 30-3, PageID #495; ECF No. 30-4, PageID #497.)  The January 2005 limited warranty does not include any material changes. The March 2008 limited warranty changed the warranty period, as compared to the 1999 limited warranty, from "for as long as the residential dwelling is owned and occupied by the original owner" to "a period of ten years."  (ECF No. 30-3, PageID #495; ECF No. 30-6, PageID #501.)

10

### C.3.  Cresline Plastic

Cresline Plastic provided two statements of express warranty dating from 1997, when Ms. Martin's home was built.  First, the terms and conditions provided to the purchaser warranted that the product "shall be free of . . . any and all defects in material and workmanship" and limited liability to replacement of any defective pipes and fittings.  (ECF No. 37-1, PageID #770.)  In its entirety, the provision states:

> 2.   REPRESENTATIONS, WARRANTIES AND DISCLAIMERS—Seller represents and warrants that each item of merchandise shall be free of rot, rust, electrolytic corrosion and any and all defects in material and workmanship for the Seller's applicable limited warranty period, if any, as provided for in Seller's product literature.  The Seller's complete responsibility for its warranty is limited to the furnishing of sufficient plastic pipe and fittings to replace defective materials.  SELLER HEREBY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND ALL IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE. SELLER HEREBY DISCLAIMS ALL INDEMNITIES AND PROVISIONS FOR ASSESSMENT OF ATTORNEY FEES AND EXPENSES.

(*Id*.)

Second, accompanying its terms and conditions, Cresline Plastic included similar language:

> LIMITED WARRANTY
>
> CRESLINE PIPE IS GUARANTEED AGAINST ROT, RUST, AND ELECTROLYTIC CORROSION, AND TO BE FREE FROM DEFECTS IN MATERIAL AND WORKMANSHIP.  THE MANUFACTURER'S COMPLETE RESPONSIBILITY IS LIMITED TO THE FURNISHING OF SUFFICIENT PLASTIC PIPE AND FITTINGS TO REPLACE MATERIALS ACKNOWLEDGED BY IT TO BE DEFECTIVE.

In addition, Plaintiffs allege Cresline Plastic created express warranties for FlowGuard Gold products through "brochures, catalogs, websites and marketing materials."  (*Id.*, ¶ 200, PageID #230.)

11

**D.     Plaintiffs' Proposed Class Definitions**

Plaintiffs seek to certify a nationwide class of individuals and entities who have owned houses or other structures in which FlowGuard Gold sold by Charlotte Pipe (or its predecessor Thompson Plastics) or Cresline was installed since January 1, 1991. (*Id.*, ¶ 132, PageID #216.)  Specifically, they seek certification of a nationwide class comprising:

> All individuals and entities that own or have owned homes or other structures located in the United States in which FlowGuard Gold CPVC sold by Charlotte Pipe and Foundry Company, Thompson Plastics, Inc., or Cresline Plastic Pipe Co., Inc. is or was installed from January 1, 1991 to present.

(*Id.*)

Plaintiffs also seek certification of four State classes—for houses or other structures located in Arizona, Massachusetts, Michigan, and Washington.  (*Id.*, PageID #216–17.)   For the Arizona, Massachusetts, and Washington classes, Plaintiffs name Charlotte Pipe as the defendant.  Other than the particular State, each seeks to certify a class of:

> All individuals and entities that own or have owned homes or other structures located in the State of Arizona in which FlowGuard Gold CPVC sold by Charlotte Pipe and Foundry Company or Thompson Plastics, Inc. is or was installed from January 1, 1991 to present.

 (*Id.*)  For the proposed Michigan class against Cresline Plastic, Plaintiffs define the class as including:

> All individuals and entities that own or have owned homes or other structures located in the State of Michigan in which FlowGuard Gold CPVC sold by Cresline Plastic Pipe Co., Inc. is or was installed from January 1, 1991 to present.

12

(*Id.*, PageID #217.)   None of the classes Plaintiffs define include Lubrizol.   (*Id.*, PageID #216–17.)

## PROCEDURAL CONSIDERATIONS

Rule 23 directs that courts determine "[a]t an early practicable time" whether to certify a class.  Fed. R. Civ. P. 23(c)(1)(A).  At the outset, the parties dispute whether a motion to strike before much discovery has occurred presents a procedurally appropriate device to raise the question of certification.  Defendants bring their motion pursuant to Rule 12(f) and Rule 23.  The Court begins by considering the procedural propriety of each option.

### A.     Rule 12(f)

Under Rule 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  On the face of the Rule, class allegations do not present "redundant, immaterial, impertinent, or scandalous matter" subject to striking under Rule 12(f).  Nor does the Rule contemplate dismissal of a pleading in whole or in part.  Other provisions of the rules do that more substantive work.  A motion to strike class allegations, then, amounts to a square peg Defendants try to hammer into a round procedural hole.

Other procedural difficulties accompany using Rule 12(f) for such a motion.  The Rule has timing requirements.  *See* Fed. R. Civ. P. 12(f)(2) (requiring a motion to strike before a responsive pleading or within 21 days of one).  But that deadline lapsed long ago.  Further, Rule 12(g)(2) limits the ability of a litigant to file multiple or successive motions directed at the pleadings.  It provides that a party, like Defendants here who previously moved to dismiss under Rule 12(b)(6), "must not

13

make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Defendants could have moved to strike class allegations as part of their prior motions to dismiss, if Rule 12(f) provided a proper procedural vehicle to do so. Therefore, the bar on multiple Rule 12 motions forecloses a second motion now, including a motion to strike class allegations under Rule 12(f).

### B. Rule 23

Rule 23(d)(1)(D) provides that a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." In *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011), in a lawsuit alleging deceptive advertising of a healthcare discount program, the district court granted a motion to strike class allegations before the plaintiffs moved for certification of their putative nationwide class. On appeal, the plaintiffs contended that decision was premature. On the circumstances presented in *Pilgrim*, the Sixth Circuit rejected the argument. *Id.* at 949. In particular, the defect in the proposed class there turned on the application of the laws of different States, and no amount of discovery could change that legal determination. *Id.*; *see also id.* at 946. Consistent with a basic rule of textual interpretation that a specific provision (Rule 23) controls over a general one (Rule 12(f)), the Sixth Circuit in *Pilgrim* rested on analysis of Rule 23 and did not mention Rule 12(f). *See id.* at 949.

Since *Pilgrim*, district courts decide certification issues "where it is facially apparent from the pleadings that class claims cannot satisfy one or more of Rule 23's

14

requirements," *Legrand v. IntelliCorp Records, Inc.*, No. 1: 15 CV 2091, 2016 U.S. Dist. LEXIS 38690, at *7 (N.D. Ohio Mar. 22, 2016), or "where the complaint itself demonstrates that the plaintiff cannot meet the requirements for maintaining a class action," *Jackson v. Cuyahoga Cnty.*, No. 1:20-CV-02649, 2021 U.S. Dist. LEXIS 156300, at *6 (N.D. Ohio Aug. 19, 2021) (quoting *Johnson v. Geico Choice Ins. Co.*, No. 1:18-cv-1353, 2018 U.S. Dist. LEXIS 207938, 2018 WL 6445617, at *4 (N.D. Ohio Dec. 10, 2018)).  Based on *Pilgrim* and its progeny, the Court agrees with Defendants that Rule 23(d)(1)(D) provides for a pre-certification motion to strike, at least in circumstances like those here and limited to purely legal questions or those resolved with little factual development.

However, Rule 23 demands rigorous analysis and proof sufficient for Plaintiffs to carry their burden of meeting the requirements for class certification.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  And the law of the Circuit acknowledges that, before discovery, a motion to strike tests whether Plaintiffs may certify a class as pleaded, which is to say as a matter of law or based on with limited development of the record.  Put another way, a motion to strike raises the question of certification before a plaintiff moves to certify a class, even with little to no discovery, where the complaint shows that maintaining a class is not possible.  *See Colley v. Proctor & Gamble Co.*, No. 1:16-cv-918, 2016 U.S. Dist. LEXIS 137725, at *8, 2016 WL 5791658, at *2 (S.D. Ohio Oct. 4, 2016).

Here, bearing in mind the Sixth Circuit's endorsement in *Pilgrim* of a somewhat narrow use of a motion to strike class allegations before discovery or in its

early stages, the Court limits the inquiry in the current procedural posture of this case to a threshold determination whether Plaintiffs may or may not maintain any of their remaining claims on behalf of a class as a matter of law.  In this respect, the Court treats the motion to strike as something of a pleading-stage determination.  Such a decision will have value for the parties and the Court because of the potential effects on the scope and proportionality of discovery and judicial management of any certified class.

## ANALYSIS

Standing presents a "threshold determinant[] of the propriety of judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975).  "[A]t an irreducible minimum, Article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" and that "the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986) (cleaned up).  "A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Kanuszewski v. Mich.*, 927 F.3d 396, 406 (6th Cir. 2019) (quoting *Town of Chester v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1650 (2017)).

## I.    Standing of Putative Class Members

No one contends that any of the individual class representatives lacks standing.  Instead, Defendants maintain that the proposed class definitions include potentially millions of members who have no trouble with their pipes or fittings and lack standing because they have not suffered a concrete and particularized injury in

16

fact.  At most, they say, putative class members who have not yet suffered an injury might someday experience harm if Plaintiffs' allegations that FlowGuard Gold is brittle and prone to cracking are true.  If class members have not had a problem, however, Defendants argue they lack standing.  Further, as defined, the classes include people who no longer own property with FlowGuard Gold pipes or fittings.  If they did not experience problems, such individuals will never suffer an injury.

Because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not," each class member must have standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (quoting *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)).  To establish injury in fact, a plaintiff must show that she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  For claims seeking monetary damages, "mere risk of future harm, standing alone, cannot qualify as a concrete harm." *TransUnion*, 141 S. Ct. at 2211.

On their face, Plaintiffs' proposed class definitions appear highly likely to include a large number of people or entities that purchased FlowGuard Gold and lack standing.  Although these putative class members might experience harm in the future, taking Plaintiffs' allegations as true, that risk does not confer standing. *TransUnion*, 141 S. Ct. at 2211.  Indeed, another federal court in Ohio has so held. In *Loreto v. Procter & Gamble Co.*, No. 1:09-cv-815, 2013 WL 6055401, at *4 (S.D. Ohio Nov. 15, 2013), the court granted a motion to strike class allegations based on

17

the lack of standing of the putative class members.  Reasoning that the vast majority of potential class members did not see the marketing claim at issue in that false advertising action, the court ruled that the plaintiffs could not prove they paid a price premium.  *Id.*

Plaintiffs argue that the *Loreto* Court ruled only after the record established that "less than ¼ of 1% of all purchasers" of the product might have seen the marketing at issue.  *Id.*  But that information came from materials the defendants appended to their motion to strike, which the plaintiffs did not have an opportunity to test in discovery.  In fact, the court ruled in the face of the plaintiffs' request for an opportunity for discovery.  *Id.* at *2.  Because no amount of discovery could change the fact that the marketing at issue in *Loreto* was not an advertisement subject to claims under the State law at issue, the court granted the motion to strike.

### I.A.   Alleged Harm to Class Members

Plaintiffs advance several different theories of harm every potential class member has suffered.  First, this case differs from *Loreto*, Plaintiffs say, because they paid a price premium for FlowGuard Gold, meaning they and every putative class member suffered concrete and particularized harm.  The specific paragraphs of the amended complaint to which Plaintiffs point to support that claim contain no such allegation.  One alleges that Defendants market FlowGuard Gold as tough, reliable, and durable for an extended period of time.  (ECF No. 17, ¶ 3, PageID #181.)  The other alleges that Lubrizol touts that the product "*will never fail*" due to contact with normal drinking water" and that FlowGuard Gold pipes and fittings are designed for a 50-year service life.  (ECF No. 17, ¶ 79, PageID #202.)  Neither

18

paragraph to which Plaintiffs point allege a price premium.  Nor does any other allegation in the amended complaint.

Additionally, Plaintiffs claim injury in fact because no class member would have purchased or installed FlowGuard Gold with knowledge of its alleged defects. For this argument, Plaintiffs rely on *Bearden v. Honeywell International Inc.*, 720 F. Supp. 2d 932 (M.D. Tenn. 2010).  Plaintiffs' reliance on *Bearden* is misplaced for two reasons.  Procedurally, the district court denied a motion to strike brought under Rule 12(f), which the Court has already determined is generally inappropriate for a motion to strike class allegations, and did so before the Sixth Circuit endorsed using Rule 23 to raise legal deficiencies with class allegations on a limited record in *Pilgrim*. *Bearden*, 720 F. Supp. 2d at 942.  Substantively, *Bearden* involved an unjust enrichment claim where the product at issue allegedly emitted harmful levels of ozone, resulting in harm for every purchaser.  *Id.* at 943–44.  It did not involve a case, as Plaintiffs' claims here do, where injury might occur in the future.  Because each product in *Bearden* had manifested the same alleged defect, the court was unwilling to say that class members lacked standing on the limited record there.  But that decision does not support Plaintiffs' argument that all putative class members have standing because no class member would have purchased FlowGuard Gold (if any class member knew it was purchasing the product) because of the risk of a future failure of the pipes or fittings.

Plaintiffs also rely on *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015).  There, the Sixth Circuit affirmed certification of five single-State classes of

19

consumers who purchased a probiotic supplement advertised as promoting digestive health. Because of an absence of scientific evidence that the probiotic at issue promoted digestive health for anyone, the plaintiffs alleged violations of unfair or deceptive practices statutes. With respect to standing, the court rejected the defendant's argument based on the plaintiffs' theory of liability. That is, although the defendant argued that the probiotic worked for most people, the plaintiffs alleged that the defendant deceptively advertised the product to all consumers, meaning that every potential class member experienced harm. *Id.* at 524.

From these cases, a basic principle emerges. Where an allegedly defective product results in harm to every potential class member that has already manifested, the class has standing. But where, as here, the remaining allegations show a risk of harm in the future, Plaintiffs will not be able to carry their burden under Rule 23 of establishing the propriety of class certification, making striking the class allegations an appropriate procedural response. Plaintiffs might object that discovery would show that most or all class members suffered some injury. Such a contention defies reason and commonsense. Based on the allegations of the consolidated amended complaint, the product, its alleged defects, and the ways the large number of consumers who have the pipes and fittings at issue suffer harm rules out a widespread epidemic of failures nationally or in four particular States. Simply put, the proposed classes as defined include substantial numbers of people who have not suffered an injury and, therefore, lack standing.

I.B.    **Additional Authorities and Arguments**

Plaintiffs cite three additional authorities that bear on Defendants' standing argument.  In each of the cases on which Plaintiffs rely, the claims, issues, and arguments differ materially from those alleged here.  Generally, they involve causes of action like unjust enrichment or deceptive practices based on alleged defects that already caused harm to all consumers.  None suggests they will be able to overcome the standing defect in their class definitions.

*First*, Plaintiffs rely on *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006), to argue that class members whose FlowGuard Gold pipes and fittings have not yet failed should not be excluded from the class.  There, the Sixth Circuit affirmed certification of an Ohio class of vehicle owners that "include[d] those owners who never actually experienced a manifestation of the alleged defect." *Id.* at 550.  But the court did not discuss standing for members of that class, and the defendant appears to have limited its argument about owners who did not experience the alleged defect to the typicality and adequacy of the named class representative. *Id.* at 552–54.

*Second*, Plaintiffs make the same point by citing *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 722 F.3d 838 (6th Cir. 2013).  There, the Sixth Circuit relied on *Daffin*, among other cases, to conclude "under Ohio law that not all class members must demonstrate manifestation of biofilm and mold growth in their [washing machines] before those individuals may be included in the certified class." *Id.* at 857.  But that discussion related to the injury all members of the certified class experienced in the plaintiffs' premium-price theory, which is not part of the case here.  Again, the court did not discuss standing of class

21

members beyond briefly noting that such a theory satisfies standing requirements. *Id.*

*Third*, *Glazer* relied on *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010).  In *Wolin*, the Ninth Circuit rejected an argument that the failure of the alleged defect at issue to manifest in a majority of class members' vehicle precluded certification.  *Id.* at 1173.  The court took up this issue under its precedent in the context of arguments over commonality.  It did not consider standing of class members.

Defendants' motion to strike presents the difficult procedural problem that Plaintiffs through discovery might be able to establish that some significant percentage of class members have standing.  Even then, *TransUnion* teaches that a federal court may not award relief to any uninjured plaintiff.  141 S. Ct. at 2208. Plaintiffs' class definitions unavoidably include such individuals.  Finally, Plaintiffs seek to avoid this problem by pointing to the State subclasses the amended complaint pleads.  But the State classes Plaintiffs seek to certify suffer from the same legal defect.  There is no allegation or reason to believe that FlowGuard Gold pipes and fittings failed in Washington or Arizona, for example, to any greater degree than the rest of the nation.

*     *     *

For these reasons, the Court determines that the class allegations in the amended complaint may not be maintained as a matter of law because Plaintiffs cannot show that members of the putative classes have standing, and no amount of discovery will be able to overcome this defect.

22

## II.    Rule 23(b)(2) Class

Plaintiffs also seek certification of a class under Rule 23(b)(2) requesting injunctive and declaratory relief.  Under this rule, a plaintiff may maintain a class action if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Certification of this sort of class action depends on "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  Put another way, Rule 23(b)(2) only permits certification where a single declaratory judgment will apply to every class member.  *Id.*  This is so because of the indivisible nature of declaratory relief at issue, which will apply to all class members or none of them.  *Id.*

Although *TransUnion* formally addressed the risk of future harm only for claims seeking monetary damages, 141 S. Ct. at 2211, for purposes of standing it is difficult to see how that principle of standing under Article III does not extend to claims for equitable relief as well.  Additionally, two features of Rule 23(b)(2) make certification of a class here improper on the face of the classes Plaintiffs seek to certify.  First, according to the Supreme Court, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."  *Dukes*, 564 U.S. at 360–61.  "[I]ndividualized monetary claims

23

belong in Rule 23(b)(3)." *Id.* at 362. Second, the Supreme Court held that Rule 23(b)(2) does not permit class certification where "the monetary relief is not incidental to the injunctive or declaratory relief." *Id.* at 360. Fundamentally, Plaintiffs seek an award of monetary damages, both for themselves and on behalf of the classes they seek to represent. Moreover, the monetary relief or costs associated with any injunction or declaration of rights applying to all consumers would not be incidental to such a remedy, instead mandating substantial expenditures. For example, a repair-or-replace remedy would carry enormous costs and necessarily implicate the same standing deficiencies as a class or classes under Rule 23(b)(3) because it would extend to those who have not suffered harm and might not. Accordingly, *Wal-Mart v. Dukes* forecloses certification of a class under Rule 23(b)(2) here.

## III. Certification

Under Rule 23(f), a court of appeals may grant interlocutory review "from an order granting or denying class-action certification." Fed. R. Civ. P. 23(f). Obviously, Rule 23(f) does not describe an order under Rule 23(d)(1)(D). Nonetheless, with respect to standing, Defendants' motion to strike "involves a controlling question of law as to which there is substantial ground for difference of opinion," and "an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]" 28 U.S.C. § 1292(b). In the Court's opinion, the questions of law addressed in this Opinion and Order, over which there is substantial ground for differences of opinion among reasonable jurists and lawyers, might well prove outcome-determinative in this case. Without class allegations, Plaintiffs might have little incentive to pursue their claims. Therefore, appellate review will materially

advance the resolution of this case on the merits.  Without review, this action is likely at or near its end.  Accordingly, the Court certifies this Order for interlocutory review under Section 1292(b).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to strike (ECF No. 54.)  Accordingly, pursuant to Rule 23(d)(1)(D), the Court **ORDERS** Plaintiffs to amend their complaint to eliminate class allegations and to do so no later than 21 days from the date of this Order.  When amending the complaint, the Court directs Plaintiffs to comply with the Court's Civil Standing Order for filing amendments and to make no other substantive amendments or changes to the complaint.  Further, pursuant to 28 U.S.C. § 1292(b), the Court **CERTIFIES** this Order for interlocutory review.

**SO ORDERED.**

Dated:  February 1, 2022

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio